IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Andre Baculik, | ) | C/A No.: 1:20-935-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Andrew M. Saul, Commissioner of | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Donald C. Coggins, Jr., United States District Judge, dated May 1, 2020, referring this matter for disposition. [ECF No. 11]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 10].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons

that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On April 28, 2016, Plaintiff filed an application for SSI in which he alleged his disability began on November 1, 2014. Tr. at 166–68, 169–78. His application was denied initially and upon reconsideration. Tr. at 93–96, 98–103. On September 19, 2018, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Linda Diane Taylor. Tr. at 30–54 (Hr'g Tr.). The ALJ issued an unfavorable decision on January 30, 2019, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 14–29. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on March 4, 2020. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 57 years old at the time of the hearing. Tr. at 35. He completed some college. Tr. at 36. His past relevant work ("PRW") was as a

flooring installer, a delivery driver, a painter, and a landscaper. Tr. at 37. He alleges he has been unable to work since November 1, 2014. Tr. at 169.

### 2. Medical History

Plaintiff presented to the emergency room ("ER") at McLeod Seacoast Hospital ("MSH"), with a complaint of left ankle pain and swelling on December 14, 2014. Tr. at 336. He reported having twisted his ankle upon losing control of his moped two days prior. *Id.* Timothy Carr, M.D. ("Dr. Carr"), noted a large left ankle effusion, an intact fibula, an atraumatic foot, and bimalleolar and Achilles pain. Tr. at 340. X-rays of the left ankle showed a small ligamentous avulsion. Tr. at 342.

On April 10, 2015, Plaintiff presented to Deborah Moyer, ANP ("NP Moyer"), with reports of a three-week history of right great toe pain and a four-month history of stabbing pain in his left foot. Tr. at 361. He stated he had been using ice compression without relief. *Id.* He suspected he had gout. *Id.* Plaintiff admitted he had been drinking a lot of beer and other alcohol and eating a lot of steak and seafood. *Id.* NP Moyer noted Plaintiff's first metatarsophalangeal ("MTP") joint was red and swollen and his uric acid level was 6.4 mg/dL. *Id.* She assessed gout and body mass index ("BMI") between 30.0 and 30.9. Tr. at 362. She administered Methylprednisolone Acetate and Dexamethasone Sodium Phosphate injections and prescribed Uloric 40 mg and Indomethacin 50 mg. Tr. at 362–63. She advised Plaintiff to

avoid alcohol, red meat, and seafood and to follow up for lab work in a week. Tr. at 363.

Plaintiff followed up with NP Moyer for gout on April 24, 2015. Tr. at 358. He reported improved symptoms on Uloric 40 mg daily, but stated he had run out of the free samples and had been informed when he attempted to fill the prescription that it would cost over $300 for a 30-day supply. *Id.* He said he received a coupon he could not use because he had not been approved for a prescription assistance plan. *Id.* He indicated he had no insurance. *Id.* NP Moyer noted Plaintiff's uric acid level had decreased to 4.3 mg/dL. *Id.* Plaintiff stated he continued to have symptoms of gout in his fingers, hands, ankles, feet, and toes, but admitted they had improved since taking Uloric. *Id.* NP Moyer observed swelling, erythema, and deformity of the feet and toes; tenderness on palpation of the feet; pain elicited by motion of the foot; and bilateral antalgic gait. Tr. at 358–59. She advised Plaintiff to avoid shellfish and red meat and to follow a low purine diet, discussed concerns over alcohol use, and continued his medications. Tr. at 359–60. She referred Plaintiff to someone in her office who assisted him to complete an application for prescription assistance. Tr. at 360.

On July 10, 2015, Plaintiff complained that his right great toe had been red and painful for a few days and that Uloric was ineffective. Tr. at 357. Preeth Menon, M.D. ("Dr. Menon"), observed a red and painful metatarsal

joint. *Id.* He assessed ankle joint pain and gout, supervised administration of a Methylprednisolone Acetate injection, and prescribed Uloric 40 mg, Meloxicam 7.5 mg, Colcrys 0.6 mg, and Tramadol 50 mg. *Id.*

On July 25, 2015, Plaintiff presented to MSH with a complaint of left ankle pain, following a car accident. Tr. at 318. Dena Pozeg, PA ("PA Pozeg"), noted no swelling or deformity and full ROM of the left ankle. Tr. at 324. X-rays showed no evidence of acute fracture or dislocation. Tr. at 325. They indicated osteopenia and degenerative changes particularly affecting the tibiotalar articulation. *Id.* PA Pozeg diagnosed ankle pain. *Id.*

Plaintiff followed up with Dr. Menon for treatment of gout on September 11, 2015. Tr. at 356. He denied drinking alcohol and indicated he had eliminated all seafood, except for fish. *Id.* He reported redness and pain in his right foot and great toe that had started the prior day. *Id.* Dr. Menon observed right great metatarsal joint flare erythema. *Id.* He assessed gout, administered Methylprednisolone Acetate and Depo-Medrol injections and prescribed Meloxicam 7.5 mg, Colcrys 0.6 mg, Prilosec 40 mg, and Percocet 5-325 mg. *Id.*

Plaintiff complained of severe right foot pain and requested medication on October 16, 2015. Tr. at 354. Dr. Menon noted podagra erythema on physical exam. Tr. at 354–55. He assessed primary gout of the ankle and foot.

Tr. at 355. He supervised administration of a Methylprednisolone Acetate injection and refilled Plaintiff's medications. *Id.*

On December 11, 2015, Plaintiff reported three gout flares since his prior visit. Tr. at 352. He indicated he was taking his medication as prescribed and requested prescription refills. *Id.* He noted he had stopped smoking marijuana three months prior and had developed a burning sensation in his throat and pain in the anterior and posterior aspects of his left lung. *Id.* Dr. Menon noted normal findings on physical exam and assessed primary gout of the ankle and foot. Tr. at 352–53. He refilled Plaintiff's medications and ordered chest x-rays. Tr. at 353. The x-rays showed no acute cardiopulmonary disease. Tr. at 367–68.

Plaintiff presented to Dr. Menon for a pain medication refill on January 8, 2016. Tr. at 350. He reported two gout flare-ups over the prior month and sought guidance on actions to prevent flare-ups. *Id.* He described moderate left foot pain that was sometimes dull and sometimes throbbing. Tr. at 351. He complained of some anxiety. *Id.* Dr. Menon noted normal findings on exam and assessed primary gout of the ankle and foot. *Id.* He refilled Percocet 10-325 mg, Uloric 40 mg, Carafate 1 gm, Nexium 40 mg, and Meloxicam 7.5 mg. *Id.* He declined to refer Plaintiff to physical medicine and rehabilitation because he lacked insurance. *Id.*

Plaintiff followed up with Dr. Menon for gout and medication refills on March 1, 2016. Tr. at 349. He complained of left foot pain and a one-month history of right shoulder pain that caused some difficulty lifting. *Id.* He indicated he had experienced two flare-ups of gout and described his pain as moderate, rating it as a six of 10. *Id.* Dr. Menon noted normal findings on exam. Tr. at 349–50. He assessed gout and primary gout of ankle and foot. Tr. at 350. He ordered a Methylprednisolone Acetate injection and refilled Percocet 10-325 mg. *Id.* Plaintiff declined physical therapy, as he lacked insurance. *Id.*

Plaintiff followed up with Dr. Menon for gout in his right foot on May 2, 2016. Tr. at 348. He denied new issues and increased pain and indicated his medication worked when he experienced gout attacks. *Id.* Dr. Menon noted Plaintiff's mood was dysthymic. Tr. at 349. He assessed gout and a BMI between 30.0 and 39.9. *Id.* He prescribed Percocet 10-325 mg, Uloric 40 mg, Carafate 1 gm, Medrol Dosepak 4 mg, and Nexium 40 mg. *Id.*

On June 2, 2016, Plaintiff complained of a gout flare-up in his right foot and requested medication refills. Tr. at 401. Dr. Menon noted normal findings on exam, aside from dysthymic mood. Tr. at 401–02. He supervised administration of Methylprednisolone Acetate and Toradol injections and ordered a Medrol Dosepak, Carafate 1 gm, Colcrys, Percocet, and Meloxicam.

7

Tr. at 402. He subsequently discontinued the Medrol Dosepak and Carafate, as Plaintiff could not afford them. *Id.*

On July 6, 2016, Plaintiff reported a gout flare-up and indicated his pharmacy informed him he had no refills for Uloric. Tr. at 400. He also complained of a spider bite and requested that Percocet be refilled. *Id.* Dr. Menon noted he had prescribed a six-month supply of Uloric in May. *Id.* He observed abnormal redness on the dorsum of Plaintiff's foot and a small cellulitic area. Tr. at 400–01. He prescribed Clindamycin HCl 300 mg for an infected spider bite and refilled Percocet, Uloric, and Colcrys. Tr. at 401.

Plaintiff presented to Regina A. Roman, D.O. ("Dr. Roman"), for a consultative exam on July 11, 2016. Tr. at 379–84. He complained of severe gout in his right foot and ankle with flares occurring five to six times per month. Tr. at 381. He reported he was unable to walk without use of a crutch or cane during flare ups. *Id.* He described pain related to gout as so severe that it caused elevated blood pressure and headaches. *Id.* He indicated he had injured his left ankle in a car accident in July 2015 and had osteopenia and degenerative findings. *Id.* He also reported an injury to his left shoulder in 2001 with continued stiffness and decreased range of motion ("ROM"). Tr. at 382. Plaintiff admitted to drinking a quart of liquor per month, despite having been told to stop drinking due to his gout. *Id.* Dr. Roman noted multiple erythematous-appearing lesions of varying sizes throughout the

distal right lower extremity and foot. Tr. at 383. She described Plaintiff as having a slow gait, favoring his right foot, and not using an assistive device. *Id.* Plaintiff demonstrated negative straight-leg raising ("SLR") test, 5+/5 bilateral grip strength, and no atrophy, 2+ reflexes, and symmetrical, 2+ pulses in the bilateral upper and lower extremities. Tr. at 380, 383–84. He showed full ROM of the cervical spine, right shoulder, elbows, wrists, hips, and left ankle and normal ROM with left shoulder adduction and internal and external rotation and lumbar extension and lateral flexion. Tr. at 379, 383. Dr. Roman observed left shoulder abduction to 140/150 degrees and forward elevation to 140/150 degrees and right ankle dorsiflexion to 16/20 degrees and plantar flexion to 30/40 degrees. *Id.* She assessed recurrent gout of the right foot and ankle, arthritic changes and osteopenia to the left ankle, remote left shoulder injury with mildly decreased ROM, and somewhat elevated blood pressure. Tr. at 384.

On August 5, 2016, Plaintiff reported his gout would not go away, despite use of Colchicine and Uloric. Tr. at 399. Dr. Menon prescribed Percocet 10-325 mg for acute pain and refilled Plaintiff's other medications. *Id.*

On August 10, 2016, x-rays of Plaintiff's right ankle showed mild prominence Stieda process and a small plantar calcaneal spur without acute osseous injury. Tr. at 386.

Plaintiff reported moderate right foot pain that he rated as a six on August 12, 2016. Tr. at 398. He indicated he was losing weight. *Id.* Dr. Menon noted Plaintiff's urine drug screen ("UDS") was consistent with medication compliance. *Id.* He observed mild swelling, but no erythema to the right foot. *Id.* He refilled Percocet, Colcrys, Meloxicam, and Uloric. *Id.*

Plaintiff followed up for medication refills and denied complaints on September 12, 2016. Tr. at 397. Dr. Menon noted dysthymic mood, but otherwise normal findings on exam. *Id.* He assessed gout and alcohol abuse and refilled Plaintiff's medications. Tr. at 397–98.

On September 30, 2016, state agency medical consultant Cynthia Heldrich, M.D. ("Dr. Heldrich"), reviewed the record and assessed Plaintiff's physical residual functional capacity ("RFC") as follows: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; limited push/pull in the right lower extremity during flares of gout; frequently kneeling, crouching, crawling, and climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; frequent front, lateral, and overhead reaching with the left upper extremity; and avoiding concentrated exposure to extreme cold and hazards. Tr. at 65–68. A second state agency medical consultant, George Walker, M.D. ("Dr. Walker"), reviewed the record and assessed the same physical RFC, except

10

that he specified Plaintiff would be limited to frequent pushing and pulling with the right lower extremity during flares of gout. *Compare* Tr. at 65–68, *with* Tr. at 81–85.

Plaintiff presented to Dr. Menon with a gout flare on October 11, 2016. Tr. at 396. He admitted he had been drinking beer and had not been following a low purine diet. *Id.* Dr. Menon noted right foot pain and gout on exam. *Id.* He prescribed Percocet 10-325 mg. *Id.*

On November 10, 2016, Plaintiff reported having had four episodes of gout over the prior month. Tr. at 395. He also complained of right foot pain and bruising from a recent fall. *Id.* Dr. Menon observed right foot gout. *Id.* He assessed chronic pain syndrome and gout and prescribed Percocet 10-325 mg. *Id.*

Plaintiff reported a gout flare-up on December 8, 2016. Tr. at 415. He rated his pain as a five and requested refills. *Id.* Dr. Menon noted gait abnormality and dysthymic mood. Tr. at 415–16. He refilled Plaintiff's medications. Tr. at 416.

On December 19, 2016, x-rays of Plaintiff's right foot showed preserved joint spaces and no acute fracture, dislocation, focal bony lesion or significant soft tissue swelling. Tr. at 414. They indicated a small calcaneal spur and mild arthritic changes at the first MTP joint. *Id.*

On December 26, 2016, state agency psychological consultant Catherine Blusiewicz, Ph.D. ("Dr. Blusiewicz"), reviewed the record and considered Listing 12.04 for affective disorders. Tr. at 79–80. She assessed Plaintiff as having no restriction of activities of daily living ("ADLs"), difficulties in maintaining social functioning, repeated episodes of decompensation, or difficulties in maintaining concentration, persistence, or pace. *Id.*

On December 27, 2016, Dr. Menon noted Plaintiff's x-rays showed a spur and his UDS showed compliance. Tr. at 413 Dr. Menon noted no abnormal findings on exam. *Id.* He assessed chronic pain syndrome, gout, and alcohol abuse with an enlarged liver and renewed Plaintiff's prescriptions. Tr. at 413–14.

Plaintiff denied any complaints on April 27, 2017. Tr. at 426. He rated his chronic foot pain as a five. *Id.* Dr. Menon indicated Plaintiff's UDS was consistent with prescribed treatment. *Id.* He assessed ankle joint pain and prophylactic use of long-term medication and renewed Plaintiff's prescriptions. Tr. at 426–27.

Plaintiff rated chronic ankle pain as a four and indicated it was controlled on May 31, 2017. Tr. at 430. Dr. Menon noted Plaintiff's UDS was consistent with prescribed treatment. *Id.* He recorded normal findings on physical exam and refilled Plaintiff's medications. Tr. at 430–31.

Plaintiff presented to Dr. Menon for medication refills on August 1, 2017. Tr. at 432. He endorsed foot pain and chronic gout that he rated as a four at present and a six at its maximum. *Id.* Dr. Menon acknowledged that Plaintiff's UDS was consistent with the prescribed treatment. *Id.* He recorded normal findings on physical exam and refilled Percocet. Tr. at 432–33.

Plaintiff reported right foot gout and requested medication refills on October 2, 2017. Tr. at 434. Dr. Menon observed dysthymic mood, but otherwise normal findings on exam. *Id.* He refilled Percocet, Diclofenac Sodium, and Uloric. Tr. at 435.

Plaintiff endorsed chronic pain from gout and requested medication refills on December 1, 2017. Tr. at 437. Dr. Menon noted dysthymic mood, but otherwise normal findings on exam. *Id.* He refilled Percocet, Diclofenac Sodium, and Uloric. Tr. at 438.

Plaintiff presented to Danny M. Kass, M.D. ("Dr. Kass"), for routine follow up on March 1, 2018. Tr. at 439. He endorsed a history of severe gouty arthropathy with chronic right foot pain. *Id.* Dr. Kass noted normal findings on exam. *Id.* He continued Plaintiff's medications, ordered a check of his uric acid level, and referred him for a colonoscopy and lab work. Tr. at 440.

On March 29, 2018, Plaintiff met with Dr. Kass to discuss the results of his recent lab work. Tr. at 442. Dr. Kass recorded normal findings on physical exam, including normal ROM of all joints tested in the upper and lower

extremities and no erythema, warmth, swelling, or joint deformities. Tr. at 442–43. He refilled Percocet, Atorvastatin, and Colcrys, increased Uloric to 80 mg daily for gout, and prescribed a supplement for vitamin D deficiency. Tr. at 443.

Plaintiff reported two recent gout attacks at a follow up visit on May 24, 2018. Tr. at 446. He requested pain medication and denied taking his cholesterol medication. *Id.* Dr. Kass refilled Atorvastatin and Colcrys. Tr. at 447.

On August 23, 2018, Plaintiff complained of a gout flare-up that had lasted three weeks. Tr. at 463. His right knee appeared very swollen. *Id.* He requested medication refills and reported noncompliance with Atorvastatin and Uloric because of "liver pain." *Id.* He denied recent alcohol use. *Id.* Dr. Kass noted Plaintiff's right knee was painful to touch, swollen, and demonstrated mild heat and redness. Tr. at 464. He prescribed a tapering dose of Prednisone and 20 Percocet 10-325 mg tablets, emphasized the need for Uloric, and referred Plaintiff to a rheumatologist. *Id.* He noted mixed hyperlipoproteinemia, gout, enlarged liver, and alcohol abuse. *Id.*

Plaintiff returned to Dr. Kass on August 30, 2018, reporting that diet and medications had not stopped his gout flare-ups. Tr. at 469. He complained of persistent right knee pain. *Id.* Dr. Kass observed right knee swelling and pain with motion. Tr. at 470. He assessed chronic internal

14

derangement of the right knee and ankle joint pain, ordered x-rays, and referred Plaintiff to an orthopedist for evaluation. *Id.* He also prescribed Uloric, vitamin D, and 20 Percocet 10-325 mg tablets. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on September 19, 2018, Plaintiff testified he had a driver's license. Tr. at 36. He said he did not have his own vehicle, but drove a friend's vehicle no more than a couple of times a week to the gas station and Food Lion. *Id.* He noted he lived alone. *Id.*

Plaintiff stated he last worked in October or November 2015. Tr. at 36–37. He said he was self-employed as a flooring installer prior to having stopped work. Tr. at 37.

Plaintiff testified he was unable to work because of gout attacks that lasted for weeks and were sometimes so painful that he could not move. Tr. at 38. He indicated he experienced the greatest pain in his right knee. *Id.* He said his right knee had recently swollen to the size of a grapefruit, but the swelling had subsequently improved. *Id.* He stated gout affected both feet, his knees, his shoulders, and his elbows, but did not affect his hands. Tr. at 38, 45. He noted he was taking Uloric and sometimes used Colchicine. Tr. at 38. He stated his doctor had previously prescribed Percocet for his pain, but was

no longer prescribing it. *Id.* He said he had not taken Uloric over the last couple of days, even though it was prescribed for daily use, because his doctor had indicated it could worsen his flare-ups. *Id.* He indicated he had stopped drinking alcohol and eating processed foods and rarely ate red meat. Tr. at 38–39. He stated he had stopped drinking three years prior. Tr. at 40. He said he used ice nearly every day to reduce his pain. *Id.* He noted his doctor had recently prescribed Prednisone, but it had been ineffective. *Id.* Plaintiff said he typically saw his doctor monthly. *Id.* He indicated his gout flared for more than half of a typical month. Tr. at 44, 45. He stated his gout flares had become more frequent and severe, noting they were a six on the pain scale and occurred for about four or five days a month in 2015 and were a nine and sometimes lasted for three weeks at a time at present. Tr. at 47–48.

Plaintiff described problems with his left shoulder. *Id.* He said he had injured his shoulder in a car accident in 2001 and it had not healed properly. *Id.* He indicated gout also affected his left shoulder. *Id.* He denied receiving treatment or having had surgery and did not recall having had injections. Tr. at 40–41. He recalled having participated in physical therapy that provided some temporary relief. Tr. at 41.

Plaintiff testified he had injured his left ankle in a car accident a couple of years prior. *Id.* He denied having participated in physical therapy for the ankle, but said he thought he recalled having received an injection. *Id.* He

stated the pain in his left ankle typically flared up a couple of times per month. Tr. at 44. He described his ankle as "black and blue" and throbbing and said he could not walk at times. *Id.*

Plaintiff described watching television, listening to CDs, and "hop[ping] around" during a typical day. Tr. at 41. He said he was able to care for his personal hygiene and prepare food for himself. Tr. at 41–42. He stated he had "a lady" who helped him with laundry, cooked for him, vacuumed his floors, washed his dishes, and gave him rides to the store. Tr. at 42. He said his former hobbies had included riding his bike and playing soccer, but he no longer did them. *Id.* He said he walked around his neighborhood when he was having a good day. *Id.*

Plaintiff testified the length of time he could stand was affected by the area where his gout presented. Tr. at 43. He said if his gout was not affecting his foot or his knee, he could stand for 10 minutes to half an hour. *Id.* He estimated he could walk a couple hundred yards at a time on a good day. *Id.* He said he could sit for hours at a time. *Id.* He denied problems standing on a good day. Tr. at 45. He indicated his left hand felt weak, at times. *Id.* He said he had poor vision. Tr. at 46. He noted his pain would reduce his ability to stay on-task during gout flares. Tr. at 47.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Ashley Harrelson Johnson reviewed the record and testified at the hearing. Tr. at 50–53. The VE categorized Plaintiff's PRW as a delivery driver, *Dictionary of Occupational Titles* ("*DOT*") number 906.683-022, as requiring medium exertion and a specific vocational preparation ("SVP") of 3 and a floor layer, *DOT* number 864.481-010, as requiring medium exertion and an SVP of 6. Tr. at 51. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform the full range of medium work, except for frequent climbing of ramps and stairs; never climbing ladders, ropes, or scaffolds; frequent stooping, kneeling, crouching, crawling, and overhead reaching with the left upper extremity; and avoiding concentrated exposure to hazards and extreme cold. *Id.* The VE testified that the hypothetical individual could perform Plaintiff's PRW. *Id.* The ALJ asked whether there were any other jobs in the national economy that the hypothetical person could perform. *Id.* The VE identified medium jobs with an SVP of 2 as a hand packager, *DOT* number 920.587-010, an order picker, *DOT* number 922.687-058, and a kitchen helper, *DOT* number 318.687-010, with 175,000, 91,000, and 297,000 positions in the national economy, respectively. Tr. at 51–52.

For a second hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who was limited as described in

the first question, except would further be limited to work at the light exertional level. Tr. at 52. She asked if the individual would be able to perform Plaintiff's PRW. *Id.* The VE testified he would not. *Id.* The ALJ asked if there were other jobs in the economy that the individual could perform. *Id.* The VE identified light jobs with an SVP of 2 as an inspector and hand packager, *DOT* number 559.687-074, a small parts assembler, *DOT* number 706.684-022, and an electronics worker, *DOT* number 726.687-010, with 338,000, 92,000, and 41,000 positions available in the national economy, respectively. *Id.*

For a third hypothetical question, the ALJ asked the VE to assume the individual would be limited as described in the second question, but would be absent from work more than two days per month on a consistent basis. *Id.* She asked if the individual would be able to perform Plaintiff's PRW. *Id.* The VE testified the individual would not. Tr. at 53. The ALJ asked if there were any jobs in the national economy that the individual could perform. *Id.* The VE testified there were no jobs. *Id.*

The ALJ asked the VE if Plaintiff had acquired any transferable skills from his PRW. *Id.* The VE stated he did not. *Id.*

The ALJ asked the VE if her testimony was consistent with the *DOT* and its companion publication. *Id.* The VE stated the *DOT* and its companion publications did not address absenteeism or overhead reaching and she had

provided that portion of her testimony based on her experience and training. *Id.*

Plaintiff's counsel asked the VE to assume the hypothetical individual would be off-task for 20% or more of the workday. *Id.* He asked if the additional restriction would affect the jobs previously identified. *Id.* The VE testified the additional restriction would eliminate the jobs. *Id.*

### 2. The ALJ's Findings

In her decision dated January 30, 2019, the ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since April 28, 2016, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: recurrent gout of the right foot and ankle, osteoarthritis of the left ankle, and history of [injury to] the left shoulder (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except further limited by the following: frequently climbing ramps and stairs; never climbing ladders, ropes, and scaffolds; frequently stooping, kneeling, crouching, and crawling; frequently reaching overhead with the left upper extremity; and avoiding concentrated exposure to hazards and extreme cold.

5. The claimant is capable of performing past relevant work as a delivery driver and a floor layer. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 416.965).

6.      The claimant has not been under a disability, as defined in the Social Security Act, since April 28, 2016, the date the application was filed (20 CFR 416.920(g)).

Tr. at 19–25.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)      the ALJ did not properly weigh Dr. Roman's opinion in assessing Plaintiff's RFC; and

2)      the ALJ mischaracterized the evidence in evaluating Plaintiff's subjective complaints.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.    Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 416.920(h).

decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th

Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound

foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Dr. Roman's Opinion

Following her July 2016 exam, Dr. Roman provided the following assessment:

> [Plaintiff] may require assistance taking public transportation. He should utilize one of his assistive devices if going out of his home during a flare. He would have difficulty climbing. He can walk a short distance. He would be able to bend and squat. Lifting overhead should be limited due to chronic shoulder pain.

Tr. at 384.

Plaintiff argues the ALJ erred in assessing his RFC because she improperly weighed Dr. Roman's opinion and failed to explain the reasons that supported the weight she allocated to it. [ECF No. 17 at 7]. He notes the ALJ did not specify the exact weight she accorded to Dr. Roman's opinion. *Id.* at 8. He maintains the ALJ built no "logical bridge" between her summary of the evidence and her conclusion that some of the restrictions Dr. Roman indicated were based on subjective complaints. *Id.* at 9. He contends the ALJ ignored evidence of reduced lumbar ROM, positive SLR on the right, and

multiple erythematous-appearing lesions throughout the right lower extremity. *Id.* at 10.

The Commissioner argues the ALJ considered Dr. Roman's opinion based on its supportability and consistency with the record and that substantial evidence supports her evaluation. [ECF No. 18 at 14–16]. He maintains the ALJ considered Dr. Roman's opinion that Plaintiff's ability to lift overhead was limited in restricting Plaintiff to frequent, as opposed to constant, overhead reaching with the left upper extremity. *Id.* at 16. He contends the ALJ considered Dr. Roman's opinion that Plaintiff would have difficulty climbing in limiting him to no climbing of ladders, ropes, or scaffolds. *Id.* He claims the ALJ assigned little weight to Dr. Roman's opinions that Plaintiff may require assistance in taking public transportation, should utilize an assistive device upon leaving his home during gout flares, and could walk a short distance, as these restrictions appeared to be based on Plaintiff's subjective reports and were not consistent with the objective findings. *Id.* at 16–17. He maintains the ALJ clearly articulated the weight she assigned to Dr. Roman's opinion, crediting some of the limitations and giving little weight to others. *Id.* at 17–18. He contends the ALJ's reasons for assigning little weight to aspects of Dr. Roman's opinion are included in other parts of the decision, which should be viewed as a whole. *Id.* at 18–19.

In determining a claimant's RFC, the ALJ must carefully consider medical source opinions of record. SSR 96-5p, 1996 WL 374183, at *5. The regulations require that ALJs "evaluate every medical opinion [they] receive." 20 C.F.R. § 416.927(c). Should the record lack an opinion from a treating medical source or should the ALJ decline to accord controlling weight to the treating physician's opinion, the ALJ must evaluate all medical opinions of record based on the factors in 20 C.F.R. § 416.927(c). *See Brown v. Commissioner Social Security Administration*, 873 F.3d 251, 256 (4th Cir. 2017). Factors relevant to evaluation of an opinion from a non-treating, examining physician include "'supportability' in the form of the quality of the explanation provided for the medical opinion and the amount of relevant evidence—'particularly medical signs and laboratory findings'—substantiating it," "'[c]onsistency,' meaning how consistent the medical opinion is with the record as a whole,'" and "'[s]pecialization,' favoring 'the medical opinion of a specialist about medical issues related to his or her area of specialty.'" *Id.* (citing 20 C.F.R. § 404.1527(c)(3), (4), (5)). The ALJ should also consider "any other factors 'which tend to support or contradict the medical opinion.'" *Id.* (citing 20 C.F.R. § 404.1527(c)(6)). In general, ALJs should allocate greater weight "to the medical opinion of a source who has examined [the claimant] than to the medical opinion of a medical source who has not examined [him]." 20 C.F.R. § 416.927(c)(1).

The ALJ addressed Dr. Roman's opinion as follows:

I have considered the uncontradicted opinion of Dr. Roman, an acceptable medical source who had the opportunity to perform a relatively thorough consultative examination of the claimant. (Exhibit 3F). Dr. Roman's objective findings of full strength, slow gait favoring right foot, slightly limited range of motion in the left shoulder, and reports of pain in the left ankle during testing are considered in determining the residual functional capacity. His overhead reaching is limited [to] frequent with the left upper extremity, which is consistent with Dr. Roman's opinion that his reaching overhead should be limited due to shoulder pain and her finding of only slightly reduced range of motion in his left shoulder. Similarly, the claimant's climbing of ladders, ropes, and scaffolds is completely limited, consistent with her opinion that [Plaintiff] would have difficulty climbing. However, Dr. Roman's opinion that the claimant may require assistance taking public transportation, should utilize[] an assistive device outside of his home during a flare, and that he could only walk a short distance is given little weight as it appears to be based upon the claimant's subjective reports as it is not consistent with her objective findings of full strength and no muscle atrophy.

Tr. at 23.

Elsewhere in the decision, the ALJ summarized Dr. Roman's exam findings as follows:

On exam, the consultative examiner, Regina Roman, DO, observed the claimant was ambulatory, but appeared uncomfortable. His gait was slow, favoring his right foot, but he did not utilize an assistive device. He had full range of motion of the right shoulder and only slightly reduced range of motion in the left shoulder, though he complained of discomfort with the left shoulder range of motion. He had 5+/5 grip strength in both hands and no edema, deformities, or tenderness of the hands or fingers. He had 5+5 muscle strength in all extremities and no muscle atrophy. Dr. Roman assessed the claimant with recurrent gout of the right foot/ankle, arthritic changes and osteopenia of the left ankle, remote shoulder injury with mildly reduced range

of motion, and elevated blood pressure and headaches based upon claimant's self-report.

Tr. at 22.

The court agrees with the Commissioner's assertion that the ALJ accepted some elements of Dr. Roman's opinion, as she limited Plaintiff's overhead reaching and indicated he could never climb ladders, ropes, or scaffolds. *See* Tr. at 23. In the absence of any more specific limitations from Dr. Roman as to these abilities, the ALJ reasonably considered and accounted for them in assessing Plaintiff's RFC. *See* Tr. at 20.

The court considers less persuasive the ALJ's reasons for rejecting Dr. Roman's opinion as to Plaintiff's walking ability and need for an assistive device. Dr. Roman's opinion that Plaintiff could walk a short distance and should utilize one of his assistive devices if going out of his home during a gout flare appears to be supported by her observation of multiple erythematous-appearing lesions of varying sizes throughout Plaintiff's distal right lower extremity and foot, slow gait that favored his right foot, and reduced right ankle dorsiflexion and plantar flexion. *See* Tr. at 383. Although the ALJ cited full strength and the absence of muscle atrophy, such findings are irrelevant to Plaintiff's diagnosis of gout and do not contradict the observations Dr. Roman relied on in assessing restrictions related to that impairment. In addition, the ALJ did not consider the consistency of restrictions as to walking and use of an assistive device with the record as a

whole. Although the ALJ cited "no mention of the need for or use of assistive devices in the treatment notes of [Plaintiff's] treating physician," Tr. at 23, this does not contradict Dr. Roman's opinion as she specifically noted that Plaintiff was not using an assistive device in her exam report. *See* Tr. at 383. Despite Plaintiff's failure to use an assistive device in her presence, she considered objective evidence of gait disturbance significant enough to warrant use of an assistive device. The record contains other observations of gait disturbance and diagnostic imaging reports that arguably support restrictions as to walking and use of an assistive device during gout flares. *See* Tr. at 325 (showing osteopenia and degenerative changes primarily affecting the tibiotalar articulation of the left ankle)[3]; Tr. at 358–59 (reflecting NP Moyer's observations of deformity of the feet and toes and bilateral antalgic gait); Tr. at 415 (indicating Dr. Menon's impression of "[g]ait abnormality"). The ALJ did not address evidence of gait disturbance in evaluating Dr. Roman's opinion.

Because the ALJ did not thoroughly consider whether Dr. Roman's observations supported her opinion or whether her opinion was consistent with the findings of Plaintiff's other medical providers and diagnostic test

---

[3] Immediately after summarizing Dr. Roman's exam findings, the ALJ wrote the following: "An x-ray of his right ankle performed in conjunction with the consultative exam showed his ankle joint spacing was relatively preserved and revealed only mild prominence Stieda process and small plantar calcaneal spur without acute osseous injury. (Exhibit 4F) Tr. at 22. No x-rays were taken of Plaintiff's left ankle in conjunction with the consultative exam.

results, the court finds that substantial evidence does not support her decision to accord little weight to part of the opinion. The ALJ erred to the extent that she did not carefully consider the medical source opinion in assessing Plaintiff's RFC.

### 2.     Evaluation of Subjective Allegations

Plaintiff argues the ALJ did not properly address his subjective allegations of pain and mischaracterized the evidence to support her conclusion that he was less limited than he alleged. [ECF No. 17 at 11]. He maintains the ALJ did not adequately explain which evidence she considered to be inconsistent with his subjective complaints. *Id.* at 12–13. He claims the record reflects that he experienced several flare-ups of gout per month, despite compliance with medication. *Id.* at 13. He contends his allegations as to the frequency of his gout flare-ups suggested they were work-preclusive, as the VE testified that an individual who would be absent from work two times per month would be unable to maintain competitive employment. *Id.*

The Commissioner argues Plaintiff has failed to show why the ALJ's analysis should not be afforded great deference. [ECF No. 18 at 21]. He maintains the ALJ explained that Plaintiff's subjective complaints were not entirely consistent with his reports to his medical providers. *Id.* at 22–23. He contends the ALJ further explained that Plaintiff's complaints were not consistent with findings on exam. *Id.* at 23–25. He claims the ALJ noted

Plaintiff's noncompliance and indicated his gout symptoms improved when he was compliant with treatment. *Id.* at 25–26.

"[A]n ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)[4]). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Id.* at 866 (citing 20 C.F.R. § 404.1529(b)). The ALJ only proceeds to the second step if the claimant's impairments could reasonably produce the symptoms he alleges. *Id.* At the second step, the ALJ is required to "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [his] ability to perform basic work activities." *Id.* (citing 20 C.F.R. § 404.1529(c)). She must "evaluate whether the [claimant's] statements are consistent with objective medical evidence and the other evidence." SSR 16-3p, 2016 WL 1119029, at *6. However, she is not to evaluate the claimant's symptoms "based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled." *Id.* at *4; *see also Arakas v. Commissioner, Social Security Administration*, _ F.3d _, 2020 WL 7331494 at *8 (4th Cir. Dec. 14, 2020) ("We also reiterate the long-standing law in our circuit that disability claimants are entitled to rely

---

[4] The provisions in 20 C.F.R. § 404.1529 correspond to 20 C.F.R. § 416.929 for SSI claims.

exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms.").

In evaluating the alleged limiting effect of a claimant's symptoms, the ALJ is to consider other evidence that "includes statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in [the] regulations." SSR 16-3p, 2016 WL 1119029, at *5; *see also* 20 C.F.R. § 416.929(c) (listing factors to consider, such as ADLs; the location, duration, frequency, and intensity of pain or other symptoms; any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms).

Pursuant to SSR 16-3p, the ALJ must explain which of the claimant's symptoms she found "consistent or inconsistent with the evidence in [the] record and how [her] evaluation of the individual's symptoms led to [her] conclusions." 2016 WL 1119029, at *8. "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." *Lewis*, 858 F.3d at 869 (quoting *Denton v. Astrue*, 596 F.3d 419, 425

(7th Cir. 2010)). She must evaluate the "individual's symptoms considering all the evidence in his or her record." SSR 16-3p, 2016 WL 1119029, at *8.

The ALJ found that Plaintiff's medically-determinable impairments could reasonably be expected to cause the symptoms he alleged, but that his statements concerning the intensity, persistence, and limiting effects of his symptoms "were not entirely consistent with the medical evidence and other evidence in the record." Tr. at 22. She explained that Plaintiff's statements were inconsistent with his "reports to his treating physician, the findings during routine exam, and the claimant's non-compliance with treatment." *Id.* She acknowledged Plaintiff's report of limiting shoulder pain, but noted he had "not sought treatment for shoulder pain" and had "only mildly limited range of motion to no limitations in range of motion" on exam. Tr. at 22–23. She stated Plaintiff's gout pain was "controlled when he [was] compliant with treatment" and cited his fall 2016 admission that he had not been following a low purine diet and had been drinking alcohol. Tr. at 23. She referenced Plaintiff's claim that he experienced 15 gouty days a month, but noted he had not reported a flare between March 2017 and March 2018. *Id.* She indicated that in May 2018, Plaintiff reported two episodes of gout over 60 days. *Id.* She stated Plaintiff did not report to his primary care provider with significant objective signs of a gout flare until August 2018 and denied compliance at that time. *Id.* She recognized evidence as to use of an assistive device, but

noted there was "no mention of the need for or use of assistive devices in the treatment notes of his treating physician." *Id.*

Although the ALJ acknowledged that "[t]he medical evidence affirms the claimant has regular follow up appointments for gout and multiple episodes of gout," she misrepresented the record as to the frequency and severity of his gout flares and related symptoms. *See* Tr. at 22 (citing October 2016 flare-up; noting a November 2016 report of four episodes of gout over the prior month; indicating he "denied any complaints" from April 2017 to August 2018; stating he reported right foot pain in March 2018, but denied feeling tired or poorly or having other arthralgias; claiming he denied arthralgias and had normal ROM at his next appointment; acknowledging he reported two gouty attacks between March 29, 2018 and May 30, 2018; recognizing an August 2018 presentation following a three-week flare of gout).

The record reflects that Plaintiff presented with complaints of gout flares that were corroborated by positive findings on exam on April 10, April 24, July 10, September 11, October 16, and December 11, 2015. *See* Tr. at 352–63. On December 11, 2015, Plaintiff reported having had three gout flares since his October 16 appointment. Tr. at 352–53. He reported two flares over the prior month during a follow up visit on January 8, 2016. Tr. at 350–51. He again reported two recent flares during a visit on March 1, 2016.

Tr. at 349–50. On May 2, 2016, he stated his gout flares were responding to medication. Tr. at 348–49. However, on June 6, 2016, he was experiencing a gout flare that was unrelieved by medication. Tr. at 401–02. He presented with objective signs of a gout flare on July 6, 2016. Tr. at 400–01. He complained of five to six gout flares per month when he reported to Dr. Roman for the consultative exam on July 11, 2016. Tr. at 381. He indicated his gout was not responding to medication during a follow up visit with Dr. Menon on August 5, 2016. Tr. at 399. He was experiencing another gout flare on October 11, 2016, when he admitted to drinking beer and failing to follow the recommended diet. Tr. at 396. On November 10, 2016, Plaintiff demonstrated objective evidence of a gout flare and reported four incidents of gout over the prior month. Tr. at 395. He again presented with a gout flare on December 8, 2016. Tr. at 415–16. Although the ALJ stated records between March 2017 and March 2018 fail to reflect gout flares, Tr. at 23, Plaintiff presented with complaints of gout in his right foot and right great toe on October 2, 2017 and December 1, 2017. Tr. at 434, 436, 437. During other visits over this period, Plaintiff sought medication for chronic gout and chronic pain in his feet. *See* Tr. at 426–33. Plaintiff complained of severe gouty arthropathy with chronic right foot pain and Dr. Kass assessed right foot gout on March 1, 2018. Tr. at 439–40. On March 29, 2018, Dr. Kass assessed gout and increased Uloric Tr. at 443. On May 24, 2018, Plaintiff

reported two recent gout attacks. Tr. at 446–47. On August 23, 2018, he complained of a gout flare-up that had lasted three weeks and demonstrated significant objective signs. Tr. at 463–64. He continued to endorse persistent gout-related pain during a follow up visit on August 30, 2018. Tr. at 469–70.

The ALJ summarized Plaintiff's report of his ADLs. Tr. at 21. However, in contravention of 20 C.F.R. § 416.929(c) and SSR 16-3p, she provided no explanation as to how she considered his ADLs in evaluating his allegations as to the intensity, persistence, and limiting effects of his symptoms.

The ALJ attempted to explain that Plaintiff's gout flare-ups were the result of his noncompliance with his physicians' recommendations as to diet, alcohol use, and medication, but she failed to "build an accurate and logical bridge" from the evidence to her conclusion. *See Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016). She noted Plaintiff testified "he was following a purine diet and no longer drinks alcohol or eats processed foods" and "stopped drinking 2 years ago." Tr. at 21. She stated that in July 2016, Plaintiff "reported drinking a quart of liquor per month, though he had been told to discontinue drinking due to his gout." *Id.* She cited an October 2016 medical visit in which Plaintiff "admitted he had not been following a low purine diet and had been drinking beer." Tr. at 22. She referenced Plaintiff's report of gouty attacks between March and May 2018, but noted he "admitted he had not taken his cholesterol medication." *Id.* She indicated that while

experiencing a gout flare-up in August 2018, Plaintiff "admitted he had not been compliant with Uloric and [A]torvastatin due to 'liver pain.'" *Id.* She specifically cited Plaintiff's "non-compliance with treatment" as one of her reasons for rejecting his statements about the intensity, persistence, and limiting effects of his symptoms. *Id.* She concluded Plaintiff's "gout pain is controlled when he is compliant with treatment" and again cited his report of drinking alcohol and failing to follow a low purine diet in the fall of 2016 and his indication that he had not been compliant with treatment upon presentation with a gout flare in August 2018. Tr. at 23.

The ALJ appears to conclude that Plaintiff had significant gout flares in 2016, when he admitted he was not following a low purine diet and continued to drink, and improved after he stopped drinking and started following a diet, except when he was noncompliant with his medications. Unfortunately, her explanation for her conclusion is flawed. First, as noted above, the record as to Plaintiff's gout flare-ups does not entirely support the ALJ's conclusion, as she ignored evidence of multiple gout flares. Second, the ALJ did not follow the proper procedure for reliance on evidence of noncompliance in assessing Plaintiff's subjective allegations.

Pursuant to 20 C.F.R. § 416.930(a), "[i]n order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." "[I]f the individual fails to follow

prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." SSR 16-3p, 2017 WL 5180304, at *9. However, "[w]e will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." *Id.* In *Preston v. Heckler*, 769 F.2d 988, 990–91 (4th Cir. 1985), the court explained that reliance on a finding of noncompliance to support a denial of disability benefits requires a "particularized inquiry." It held that "if noncompliance is to be a basis for denying benefits, the [Commissioner] must develop a record establishing by substantial evidence that the claimant's impairment 'is reasonably remediable by the particular individual involved, given . . . [his] social or psychological situation,' *Tome v. Schweiker*, 724 F.2d 711, 714 (8th Cir. 1984), and that this claimant lacks good cause for failing to follow a prescribed treatment program." *Id.* (citing *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984)).

Although the ALJ specifically cited Plaintiff's use of alcohol as contrary to his doctor's order to stop drinking to improve gout, Tr. at 21, she did not explain how his failure to take his cholesterol medication was linked to gout flares between March and May 2018. *See* Tr. at 22. She did not establish by substantial evidence that Plaintiff's alcohol use, dietary infractions, and

medication noncompliance were "reasonably remediable" by him "given his social or psychological situation." *See Preston v*, 769 F.2d at 990–91. Finally, she failed to address Plaintiff's report that he had not taken Uloric and Atorvastatin due to liver pain, which could serve as good cause for his noncompliance. *See* SSR 16-3p, 2017 WL 5180304, at *10 ("An individual may not agree to take prescription medications because the side effects are less tolerable than the symptoms.").

Given the foregoing errors, the court finds the ALJ failed to cite substantial evidence to support her evaluation of the intensity, persistence, and limiting effect of Plaintiff's alleged symptoms.

### 3. Request for Remand for Calculation of Benefits

Plaintiff argues that because his age progressed to 55 years[5] during the relevant period, Rule 202.06 of the Medical-Vocational Guidelines directs a finding that he is disabled if he is limited to light work.[6] [ECF No. 17 at 10–11]. He maintains remand for an award of benefits is appropriate, as "the

---

[5] The regulations define "advanced age" as "55 and over." 20 C.F.R. Pt. 404, Subpt. P, App'x 2, § 201.00(f).

[6] Rule 202.06 of the Medical-Vocational Guidelines directs a finding that an individual is disabled if the following conditions are met: (1) the individual must have a maximum sustained work capability limited to light work as a result of severe medically-determinable impairments; (2) the individual must be of advanced age; (3) the individual must be a high school graduate or more, but must not have attained education that allows for direct entry into skilled work; and (4) the individual must have a history of skilled or semiskilled work, but cannot have skills that are transferable to light work. 20 C.F.R. Pt. 404, Subpt. P, App'x 2, § 202.06.

record establishes [his] entitlement to benefits" and "remand would not change that [he] could not perform medium work or his age." *Id.* at 11.

"Whether to reverse and remand for an award of benefits or remand for a new hearing rests within the sound discretion of the district court." *Smith v. Astrue*, C/A No. 10-66-HMH-JRM, 2011 WL 846833, at *3 (D.S.C. Mar. 7, 2011) (citing *Edwards v. Bowen*, 672 F. Supp. 230, 237 (E.D.N.C. 1987)). "The Fourth Circuit has explained that outright reversal—without remand for further consideration—is appropriate under sentence four 'where the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose'" and "where a claimant has presented clear and convincing evidence that he is entitled to benefits." *Goodwine v. Colvin*, No. 3:12-2107-DCN, 2014 WL 692913, at *8 (D.S.C. Feb. 21, 2014) (citing *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974); *Veeney ex rel. Strother v. Sullivan*, 973 F.3d 326, 333 (4th Cir. 1992). An award of benefits is appropriate when "a remand would only delay the receipt of benefits while serving no useful purpose, or a substantial amount of time has already been consumed." *Davis v. Astrue*, C/A No. 07-1621-JFA, 2008 WL 1826493, at *5 (D.S.C. Apr. 23, 2008) (citing *Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984); *Tennant v. Schweiker*, 682 F.2d 707, 710 (8th Cir. 1982)). "On the other hand, remand is appropriate 'where additional administrative

proceedings could remedy defects . . . .'" *Id.* (quoting *Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir. 1989)).

Although Plaintiff notes that an award of benefits is directed as of his fifty-fifth birthday if he is restricted to light work, he has not moved to amend his alleged onset date to his fifty-fifth birthday. Thus, if the court were to remand the case for an award of benefits based on Plaintiff's argument, his entitlement to benefits prior to his fifty-fifth birthday would go unaddressed.

In addition, Plaintiff has not presented clear and convincing evidence that he is restricted to work at the light or less than the light exertional level. The record contains seemingly persuasive evidence in the form of Dr. Roman's opinion as to a need for use of an assistive device during gout flares and limited walking ability. However, the record contains no corresponding VE testimony to prove an individual with limited walking ability, but no specific restriction as to standing, would be unable to perform medium work.

The record also contains evidence that the ALJ failed to reasonably resolve as to the frequency and duration of Plaintiff's gout flares and the reasons for his noncompliance with recommended treatment.

Because reopening the record would likely provide useful evidence as to whether Plaintiff is disabled within the meaning of the Act and when he

became disabled, the court declines Plaintiff's request to remand the case for an award of benefits.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

December 29, 2020                         Shiva V. Hodges
Columbia, South Carolina          United States Magistrate Judge